MONTANA DAKOTA UTILITIES CO.,
a Division of MDU Resources
Group, Inc., Petitioner,

v.

The PUBLIC SERVICE COMMISSION
OF WYOMING, Bil Tucker, Chairman,
John R. Smyth, and Stephen N. Ellenbecker, Commissioners, Respondents.

No. 92–61.

Supreme Court of Wyoming.

Feb. 19, 1993.

Bruce S. Asay, Cheyenne, Douglas W. Schulz, Bismarck, ND, for petitioner.

Joseph B. Meyer, Atty. Gen., Michael L. Hubbard, Sr. Asst. Atty. Gen., Kristin H. Lee, Asst. Atty. Gen., Cheyenne, for respondents.

Before MACY, C.J., and THOMAS, CARDINE, URBIGKIT and GOLDEN, JJ.

GOLDEN, Justice.

In this appeal, on certification from the district court pursuant to Wyo.R.App.P. 12.09, we are asked to answer the principal questions whether in a pass-on rate increase procedure the Wyoming Public Service Commission (PSC) may adjust a gas utility's proposed apportionment of a refund ordered by the Federal Energy Regulatory Commission (FERC) and a non-gas component of the retail rate sought to be recovered by the gas utility from its customers. Underlying issues include whether PSC's adjustment actions violate the so-called filed rate doctrine, whether PSC's refund apportionment action is based on substantial evidence, whether Section 249(b) of the Rules of the Public Service Commission authorizes PSC's non-gas component adjustment action, and whether PSC's notice of the pass-on rate increase hearing was adequate under WYO.STAT. § 16-3-107(b) (1990).

We hold that in a pass-on rate increase procedure PSC may adjust the apportionment among utility-service customers of a FERC-ordered refund and may adjust a non-gas component of the retail rate to be charged utility-served customers. We hold that PSC's refund apportionment action is supported by substantial evidence, and we further hold that PSC's general statutory authority, but not Section 249(b), authorizes PSC's non-gas component adjustment action. However, in this particular instance, we hold that PSC's notice of the pass-on rate increase hearing was inadequate in regard to PSC's non-gas component adjustment action. Accordingly, we affirm in part, reverse in part, and remand for further proceedings consistent with this opinion.

ISSUES

Appellant Montana–Dakota Utilities Co. (MDU) states the issues:

1. Did the Wyoming Public Service Commission err as a matter of Law in reducing natural gas rates to Montana–Dakota Utilities Co.

 A. Commission regulations must yield if contrary to Federal Law.

 B. It is not permissible for the Commission to do indirectly what it cannot do directly.

2. Is it permissible for the Wyoming Public Service Commission to reduce natural gas rates absent an investigation as required by Statute.

3. Is the allocation of natural gas rates as ordered by the Wyoming Public Service Commission supported by substantial evidence.

4. Did the Commission unduly restrict the Petitioner's presentation.

Appellee PSC's statement of the issues is:

1. Did the Public Service Commission act in accordance with the filed rate doctrine?

2. Did the Public Service Commission act in accordance with Wyoming law?

 A) Did the Public Service Commission act in accordance with its statutory authority?

 B) Did the Public Service Commission hold an investigation in accordance with Wyoming law?

 C) Did the Public Service Commission violate Wyoming law when it reduced MDU's rates in a pass-on hearing and not a general rate case?

3. Are the rates set by the Public Service Commission just and reasonable?

 A) Was the Commission's determination of the Williston Basin refund based on substantial evidence?

B) Was the Commission's determination of the overearnings issue based on substantial evidence?

4. Is MDU precluded from raising the issue that it had been unduly restricted from presenting its case in its entirety?

## FACTS

FERC has exclusive jurisdiction over interstate wholesale natural gas rates. 16 U.S.C. § 824(b). See *Nantahala Power and Light Co. v. Thornburg*, 476 U.S. 953, 106 S.Ct. 2349, 90 L.Ed.2d 943 (1986). PSC has jurisdiction over intrastate retail natural gas rates. PSC exercises statutory powers to regulate and supervise public utilities in the State of Wyoming. WYO. STAT. § 37–2–112 (1977). Appellant MDU is authorized by PSC to provide natural gas service to residential, commercial, and industrial customers in specified certificated areas in Wyoming. MDU also serves customers in North Dakota, South Dakota, and Montana. MDU receives approximately seventy percent of its total system gas supply from Williston Basin Interstate Pipeline Company (WBI), a wholesale supplier.

FERC set the wheels of this controversy in motion by two separate actions. In the first action, FERC ordered WBI to refund to its customers $18,901,593.50. In its order, FERC did not specify the manner in which the refund was to be apportioned among the customers. In turn, WBI did not specify a refund apportionment method. Thus, MDU was left to decide in what manner it would apportion the refund among its multi-state customers. In the second action, FERC authorized WBI to increase the cost of the wholesale gas it supplied to distributors like MDU. In response to this FERC-authorized increase in the cost of gas it purchases from WBI, MDU submitted on July 26, 1991, to PSC an application to increase its retail rates pursuant to PSC's rules governing the pass-on procedure. These rules are Sections 249 and 250 and MDU's commodity pass-on Rate 88, which is PSC-authorized balancing account tariff. The gas balancing account system may be described in this way:

> [It] is a rate adjustment mechanism which allows gas distributors to obtain expedited rate changes based solely on fluctuations in the commodity cost of gas purchased by the utility. The advantage of the system is that it avoids the regulatory lag which accompanies general rate proceedings and thereby contributes to the financial stability of utilities. The Commission describes the operation of the balancing account system in the following terms:
>
> > [The] system accounts for both over and underrecoveries of gas costs in future gas commodity rate applications. The actual cost of gas experienced and the recovery of those costs in rates for the past gas balancing account period are compared with the prior estimates for that period to determine whether there should be an upward or downward adjustment to the current balancing account application. In this way a dollar for dollar recovery of gas costs is assured for the utility and consumers are not overcharged.

*MGTC, Inc. v. Pub. Serv. Comm'n of Wyoming*, 735 P.2d 103, 104 (Wyo.1987).

In preparing its pass-on rate increase application MDU factored in FERC-ordered refund, the effect of which was to decrease the overall amount of the retail rate increase sought. When factoring in the refund, MDU apportioned the refund amount based on total sales volume in each state during the refund period. Under this method, all of MDU's customers, including industrial customers, received the benefit of the refund. Thus, in MDU's original application dated July 26, 1991, MDU requested PSC's approval of a rate increase of $0.363 per dekatherm. The rate sought consisted of these factors:

1. Wholesale natural gas rate .......... $3.854/dk
2. Wyoming balancing account surcharge $0.335/dk
...................................
3. FERC-ordered WBI refund .........($0.690/dk)
4. PSC-approved non-gas component .... $0.802/dk

Total resulting authorized rate $4.301/dk

After filing this original application, MDU determined it had erred in its refund apportionment. MDU concluded that no

refund had been received for gas purchased from MDU under the particular rate schedule under which MDU purchased gas for resale to industrial customers in its multi-state service area. MDU reasoned that the error, therefore, gave industrial customers a refund when they actually were not entitled to one. To correct the perceived error, MDU filed a revised application on August 13, 1991, in which MDU excluded industrial customers from the refund, resulting in a larger net increase in residential gas rates of $0.438 per dekatherm. The following components comprised the revised rate sought:

| | | |
|---|---|---|
| 1. | Wholesale natural gas rate .. ....... | $3.854/dk |
| 2. | Wyoming balancing account surcharge | $0.335/dk |
| 3. | FERC-ordered WBI refund .......... | ($0.615/dk) |
| 4. | PSC-approved non-gas component .... | $0.802/dk |
| | Total resulting authorized rate | $4.376/dk |

On August 28, 1991, PSC issued its order granting MDU interim rate relief subject to a final order. In this interim order, PSC authorized MDU to increase its Wyoming natural gas rates by $0.363 per dekatherm subject to possible refund and hearing as established in a final order. Thus, instead of authorizing the amount sought in MDU's revised application, PSC's interim order authorized the amount requested by MDU in its original application. PSC wanted to take a closer look at the refund apportionment matter.

On August 29, 1991, PSC issued its notice and order setting MDU's pass-on application for public hearing on October 29, 1991. In its notice and order, PSC asked MDU to address its pass-on application and the matter of the refund apportionment. Noticeably absent, from the notice listing the issues to be addressed, was the issue of an adjustment in the non-gas component of the authorized rate.

By letter dated September 4, 1991, PSC Secretary Alex Eliopulos informed MDU that PSC was concerned that MDU's annual report showed its gas operations had earned an 18.69 percent rate of return in 1990, thus exceeding the last authorized rate of return of 11.05 percent. PSC had authorized the rate of return at 11.05 percent in 1984 in a general rate case which included a full cost of service analysis which used 1982 as the test year. In this September 4 letter, Secretary Eliopulos informed MDU that PSC wanted MDU to provide to PSC staff detailed information regarding the over-earnings issue, *viz.*, how each program has increased earning; an explanation of cost-savings programs, including employee information; an explanation of the impact on gas operations of the Tax Reform Act of 1986; transportation data; and information concerning new customers and loads on line in 1991 and anticipated for the next two years. MDU was also requested to provide similar explanations and information concerning its electric operations, as PSC staff perceived an over-earnings issue there as well. In the letter, PSC Secretary Eliopulos reminded MDU of that part of Section 249(b) of PSC rules which reads "if the rate-of-return is in excess of that authorized, the pass-on amount will be reduced accordingly." Absent from this letter, however, was any notice that PSC was going to treat the pass-on filing as a general rate filing.

PSC allowed the Consumer Representative Staff to intervene before the hearing date. Later, at the October 29 hearing, PSC received evidence from witnesses on behalf of both MDU and the Consumer Representative Staff.

After the hearing and submission of briefs, PSC entered its final order on February 12, 1992. In that order PSC rejected the refund apportionment contained in MDU's revised application but approved the refund apportionment contained in MDU's original application. In addition, PSC adjusted, allegedly in accordance with Section 249(b), the non-gas component of the rate from $0.802 per dekatherm to $0.705 per dekatherm, a reduction of $0.0972, to correct for MDU's over-earnings. MDU requested a rehearing, but PSC denied the request. MDU then filed its petition for review with the district court, and that court certified the matter to us.

### STANDARD OF REVIEW

■ Our standard of review for administrative action is well-known. We have said:

When a case is certified to this court pursuant to Rule 12.09, W.R.A.P., we examine the decision of the administrative agency as if we were the reviewing court of the first instance. The authority vested in a reviewing court is set forth in § 16–3–114(c)(ii), W.S. 1977 (July 1990 Repl.), as follows:

"(ii) [The reviewing court may [h]old unlawful and set aside agency action, findings and conclusions found to be:

"(A) Arbitrary, capricious, an abuse of discretion or otherwise not in accordance with law;

"(B) Contrary to constitutional right, power, privilege or immunity;

"(C) In excess of statutory jurisdiction, authority or limitations or lacking statutory right;

"(D) Without observance of procedure required by law; or

"(E) Unsupported by substantial evidence in a case reviewed on the record of an agency hearing provided by statute."

*Union Tel. Co. v. Pub. Serv. Comm'n,* 821 P.2d 550, 556 (Wyo.1991) (citations omitted).

■ In conducting our review to see if the agency action is supported by substantial evidence,

[w]e are charged by statute with an examination of the whole record to determine if there is substantial evidence to support the findings of the agency. If the agency's decision is found to be supported by substantial evidence, we cannot substitute our judgment for that of the agency, but are required to uphold its findings upon appeal.

*Mountain Fuel Supply Co. v. Wyoming Pub. Serv. Comm'n,* 662 P.2d 878, 882 (Wyo.1983) (citations omitted).

■ Our working definition of substantial evidence is

"such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." Such evidence may be less than the weight of the evidence, but cannot be clearly contrary to the overwhelming weight of the evidence. It is more than a mere scintilla of evidence or suspicion of a fact to be established.

*Mountain Fuel,* at 882 (citations omitted).

■ The party appealing the agency's determination bears the burden of proving a lack of substantial evidence. *Mountain Fuel,* 662 P.2d at 883. And,

[i]f there is present substantial evidence to support a finding of the agency, the ultimate weight to be given that evidence before the PSC, as the trier of fact, is to be determined by the PSC in light of its expertise and the experience of its members in such matters.

*Mountain Fuel,* at 883.

We have recognized that PSC,

in exercising its statutory powers to regulate and supervise public utilities in the State of Wyoming, as provided in § 37–2–112, W.S. 1977, is required to give paramount consideration to the public interest, the desires of the utility being secondary. This court cannot usurp the legislative function delegated to the PSC in setting appropriate rates, but will defer to the agency discretion so long as the results are fair, reasonable, uniform and not unduly discriminatory.

*Mountain Fuel,* at 883 (citations omitted).

■ Although this court cannot usurp the legislative function delegated to PSC, when we review that agency's exercise of its statutory powers we must keep in mind that as a regulatory agency PSC

has no inherent or common-law powers. Stated in another manner, an administrative body has only the power and authority granted by the constitution or statutes creating the same. Such statutes must be strictly construed or "any reasonable doubt of existence of any power must be resolved against the exercise thereof. A doubtful power does not exist."

*Tri–County Elec. Ass'n v. City of Gillette,* 525 P.2d 3, 8–9 (Wyo.1974) (citations omitted).

■ Since we strictly construe the statutes under which PSC exercises its regulatory power, it logically follows that we also must strictly construe the rules promulgated and adopted by PSC pursuant to those

statutes. *International Ass'n of Fire Fighters, Local No. 279 v. Civil Serv. Comm'n,* 702 P.2d 1294, 1297 (Wyo.1985). "The reasoning used in interpretation of statutes is applicable to the interpretation of rules made pursuant to the statute * * *." *Id.* With this comprehensive statement of our standard of review in mind, we now turn to the issues presented.

### The Filed Rate Doctrine Issue

■ MDU's initial position is that in a pass-on hearing PSC may neither revise the refund apportionment submitted by a utility nor reduce the non-gas component of the rate. Either action by PSC, MDU claims, would violate the so-called filed rate doctrine. We disagree.

■ In pertinent part, the filed rate doctrine "holds that interstate power rates filed with FERC or fixed by FERC must be given binding effect by state utility commissions determining intrastate rates." *Nantahala,* 476 U.S. at 962, 106 S.Ct. at 2354, 90 L.Ed.2d at 951. As explained in *Nantahala,* the doctrine originated in *Montana–Dakota Utilities Co. v. Northwestern Pub. Serv. Co.,* 341 U.S. 246, 251–52, 71 S.Ct. 692, 695, 95 L.Ed. 912, 918–19 (1951), in which a federal court had been asked to review a rate which FERC's predecessor, the Federal Power Commission, had determined as reasonable. In dismissing the claim the Court held that the complaining utility "can claim no rate as a legal right that is other than the filed rate, whether fixed or merely accepted by the [Federal Power] Commission, and not even a court can authorize commerce in the commodity on other terms." *Montana–Dakota Utilities,* 341 U.S. at 251–52, 71 S.Ct. at 695, 95 L.Ed. at 919. The doctrine applies to federal and state courts alike. *Nantahala,* 476 U.S. at 963, 106 S.Ct. at 2355, 90 L.Ed.2d at 952. As explained in *Nantahala,*

> [i]n this application, the doctrine is not a rule of administrative law designed to ensure that federal courts respect the decisions of federal administrative agencies, but a matter of enforcing the Supremacy Clause.

*Id.* See e.g., *Arkansas Louisiana Gas Co. v. Hall,* 453 U.S. 571, 101 S.Ct. 2925, 69 L.Ed.2d 856 (1981). Even before *Nantahala,* the Wyoming Supreme Court recognized the principle supporting the doctrine. We said:

> The PSC is preempted by the federal government from reviewing the reasonableness of the components of the [commodity marketing agency] wholesale electric rate increase. The result must be that the PSC can accept the federally approved wholesale rate as given and decline to require Wyoming distribution utilities to prove that such wholesale rates are just and reasonable under Wyoming rate making law and standards. Once the FERC proceedings are complete, the PSC is required to accept those rates as reasonable, and the PSC can do nothing but accept those rates as given.

*Spence v. Smyth,* 686 P.2d 597, 600 (Wyo. 1984).

MDU contends that PSC's actions violate the doctrine because they, in end-result, reduced the amount of MDU's request. Instead of receiving the requested increase of $0.438 per dekatherm, MDU received an increase of only $0.266 per dekatherm. MDU argues that the effect of PSC's order is to "trap" costs or not compensate MDU for certain federally mandated expenses which will never be recovered.

Responding to MDU's contention, PSC asserts, of course, that its actions do not violate the doctrine. With reference to its refund apportionment action, PSC explains that while FERC ordered the $18 million plus refund, it did not specify any particular apportionment among the utilities' customers. That apportionment decision was MDU's to make, subject to PSC's oversight in the interests of the public to the extent that the utility's decision affected customers within PSC's jurisdiction. In that regard, PSC contends, it has jurisdiction to review and revise any MDU apportionment decision if it determines customers are not being treated fairly under the decision made.

■ With reference to its non-gas component adjustment action, PSC explains

that the cost increase of the wholesale natural gas has survived intact and is being passed on in full to MDU's customers. It is only the non-gas component of MDU's retail rate, which is well within PSC's jurisdiction, that PSC has reduced. In support of its position, PSC points to passages in *Nantahala, Narragansett Elec. Co. v. Burke*, 119 R.I. 559, 381 A.2d 1358 (1977), *cert. denied*, 435 U.S. 972, 98 S.Ct. 1614, 56 L.Ed.2d 63 (1978), and *Pub. Serv. Co. of Colorado v. Pub. Utilities Comm'n*, 644 P.2d 933 (Colo.1982), which state that "an increase in FERC-approved wholesale rates need not lead to an increase in retail rates." *Nantahala*, 476 U.S. at 967, 106 S.Ct. at 2357, 90 L.Ed.2d at 955. Thus, under the authority of these decisions, the retail rate need not automatically head in the same direction as the wholesale rate "if costs *other than* [the FERC-regulated wholesale gas costs] were to decrease." *Id.* Addressing those *other* non-gas costs, these decisions state that the regulatory commission may treat the wholesale gas cost increase filing, the "pass-on application filing," as it treats other filings for proposed rate increase, a "general rate filing," and investigate whether the utility has experienced savings in other areas which might offset the increased price for natural gas to customers. *Nantahala*, 476 U.S. at 967–68, 106 S.Ct. at 2357, 90 L.Ed.2d at 955. The *Nantahala* court found that

> [t]his qualification is perfectly sensible. If, for example, the FERC-approved price of wholesale power rises slightly but a retailer's costs of transformation and transmission significantly decline, the retailer's overall costs might well decrease. A decrease in its retail rates might therefore be appropriate even though the cost of purchasing FERC-regulated power had increased.

*Nantahala*, 476 U.S. at 968, 106 S.Ct. at 2357, 90 L.Ed.2d at 955.

Having considered the parties' arguments, we reject MDU's contention that PSC's actions of revising the refund apportionment and adjusting the non-gas component of the retail rate violate the filed rate doctrine. We agree with PSC's explanation and the legal authority upon which it relies

to support its position. FERC did not order a particular refund apportionment; it left that decision to be made by the utility. WBI, for whatever reason, did not make that decision. That left it for MDU to apportion the refund. In MDU's original application filed with PSC, MDU apportioned the refund in a way that benefitted all classes of its customers. In its revised application, it apportioned the refund in a way that excluded the industrial user class from the benefits of the refund. Under these circumstances, it is within PSC's jurisdiction to determine whether the refund apportionment treats Wyoming customers fairly.

PSC did not reduce the amount of the FERC-approved wholesale gas cost increase. Rather, it focused its attention on other, non-FERC regulated areas of MDU's operations under its retail rates jurisdiction to determine if MDU had experienced savings in one or more of those areas which might offset the increased price for gas. Without considering, at this point, whether PSC's procedures were correct or whether the appropriate evidentiary conditions were satisfied, as we shall do that later in this opinion, we hold that the filed rate doctrine does not bar PSC from treating the pass-on filing as a general rate filing and taking such action as is appropriate within its jurisdiction.

Having resolved MDU's threshold issue, we still must review the actions taken by PSC to determine whether those actions were lawful. With respect to the refund apportionment action, MDU claims that action was not based on substantial evidence. With respect to the non-gas component reduction action, MDU claims that action suffers from several deficiencies. In particular, MDU asserts that PSC's Section 249(b) does not expressly authorize such reduction action; that although general statutory authority may permit such action if proper notice is given and if evidentiary conditions are satisfied, in this instance neither was proper notice given nor evidentiary conditions satisfied. We address these issues now.

## REFUND APPORTIONMENT

 MDU alleges PSC's refund apportionment action is not supported by substantial evidence. MDU bears the burden of proving that allegation. MDU asserts:

The only evidence in the record is that the allocation proposed by MDU was correct as Wyoming's and other states' industrial customers had not made overpayments as part of their utility purchases during the refund period. As the industrial customers had not made overpayments, they were not entitled to a refund. There is no evidence to the contrary.

In developing its argument with respect to this assertion, MDU states that in its original application it had used an apportionment methodology which apportioned the refund among all rate classifications, viz., residential, commercial, and industrial customers. In its revised application, it used an apportionment methodology which apportioned the refund among only those customers who had contributed to the overpayment initially. At the hearing, MDU's witness Don Ball explained the error in the original application in this way:

The error was that * * * Montana–Dakota apportioned the refund amount related to commodity based on total sales volumes in each state during the refund period when, in fact, there was no refund received for gas purchased from Williston Basin under rate schedule I–1 under which Montana–Dakota purchased gas for resale to industrial customers.

The error gave industrial customers a refund when they actually did not pay enough in the first place. This would be totally inappropriate and the error was corrected in the company's revised filing dated August 12, 1991.

Mr. Ball was questioned closely and to good effect by Commissioner Ellenbecker on this subject. The information developed from that questioning was revealing:

Q. Is it your position that the Wyoming industrial customers in the allocation methodology to calculate the refund are not entitled to being included in the refund calculation because they don't pay the costs associated with the refund dollar which led to the overcharge and then the resulting refund?

A. That is the basic position, and it's not only for Wyoming. It's under the circumstances a systemwide position, because the industrial customers during the refund period have really paid less than they should have.

Q. Isn't it correct that throughout the period, the Wyoming industrial customers in their retail rate period for every component of the wholesale gas charges by way of the methodology used in the state of Wyoming one single integrated unit cost of gas that includes all charges from Williston?

A. That's true in Wyoming, yes.

Q. Doesn't it follow in Wyoming that it might be therefore realistic to include industrial volumes which contributed to the payment of the refund rates from Williston might be appropriate volumes in Wyoming for the calculation of the refund since they participated in the payment of the dollars in Wyoming?

A. I don't believe so. At the time, industrial customers were still served from a cost perspective by buying gas under Williston's rate schedule in Wyoming. We have not reserved any demand levels to serve industrial customers. So if there is normal demand or contract demand reserved for a certain customer, first of all, I don't believe it's fair to charge them for it in the first place.

Q. But you know better than anyone in the room that they paid for the demand charges as a component of the unit cost of gas in their rates and now some of those demand charges are flowing back to the states in a methodology that includes volumes of use expressed as a proportion of sales or proportion of purchases which those industrial customers paid as part of their rates when they had volumes when they were on the system. Isn't that correct?

A. That—that is correct.

Q. And would you agree—

A. In Wyoming.

Q. —that that's an exclusive situation for Wyoming?

A. It is a very exclusive situation applicable only in the state of Wyoming. However, the refunds that we receive from Williston are segregated by rate component. If we look, for example, at attachment B page 1, we see that there is a commodity portion of the refund. The refunds for contract demand charges, which are labeled AEQ refund and MDQ refund, are separately set forth. We have over two million dollars of AEQ refunds.

Q. Now, staying with your attachment B page 1, which of the refund components identified in the three columns do the Wyoming industrial customers not pay for in their rate?

A. They pay for all of them.

Q. They pay for all of them?

A. That's correct.

Q. And if they pay for all of them during the period that they were on system taking sales gas, they overpaid for those components just as did the residential and commercial customers in view of the fact that the FERC has now decided there will be a refund of those dollars; isn't that correct?

A. That would be true, yes.

From Mr. Ball's entire testimony on the refund apportionment issue, PSC found:

22. MDU's evidence shows that in its initial application, it allocated the FERC refund to Wyoming service based upon the *actual usages* of all its Wyoming customers, including those industrials on line during the period of the refund. This actual usage basis for the refund period is a reasonable and correct basis, and is further supported and justified by the substantial evidence that discloses that MDU's loss of industrial customers has worked to severely increase its remaining customers' (residential and commercial) rates, including because such remaining customers must pay rates to cover the cost of that part of MDU's facilities installed to serve the industrial customers who have since elected to bypass MDU's distribution service.

We are satisfied from our examination of the whole record that substantial evidence exists to support PSC's finding. The ultimate weight to be given that evidence was to be determined by PSC in light of its expertise and the experience of its members in such matters. We hold no error exists on this issue.

THE NON–GAS COMPONENT ISSUE

MDU advances several arguments in its challenge to PSC's action in a pass-on hearing adjusting the non-gas component of the retail rate from $0.802 per dekatherm to $0.705 per dekatherm, a reduction of $0.0972, to correct for MDU's alleged over-earnings as reflected in MDU's annual reports for 1989 and 1990. Generally and briefly stated, those arguments are that (1) PSC's Section 249(b), pursuant to which PSC acted, does not authorize such action; (2) although general statutory authority authorizes PSC action to determine that retail rates are just and reasonable, PSC in this instance failed to notify MDU that PSC was going to treat the pass-on filing as a general rate filing and, in that context, investigate and determine whether non-gas costs savings existed in MDU's operations such that a reduction in the non-gas component of the retail rate was justified; and (3) PSC's reduction of the non-gas component to correct for MDU's alleged over-earnings in 1989 and 1990 does not satisfy quantitatively and qualitatively the necessary evidentiary requirements.

To achieve a better understanding of MDU's position and to place MDU's arguments in the proper perspective, we find it helpful and useful first to examine the nature and scope of the two types of rate increase applications that a utility may make before PSC.

▉ Rate activity is one of the five general areas of public utility activity regulated by PSC.[1] A public utility may not

1. Thomas J. Carroll, III, *State Jurisdiction Over the Regulation of Energy Distribution and Other* *Public Utility Services,* 15 Land & Water L.Rev. 535, 551 (1980).

charge a rate different from the rate properly filed and authorized for that utility for a particular type of service. WYO.STAT. § 37-3-102 (1977). All rates must be just and reasonable. WYO.STAT. § 37-3-101 (1977). Applications to PSC for rate increase are of two basic types, a general rate increase and a pass-on rate increase. *See, Montana–Dakota Utilities Co. v. Wyoming Pub. Serv. Comm'n,* 746 P.2d 1272 (Wyo.1987); *Spence; Great W. Sugar Co. v. Johnson,* 624 P.2d 1184 (Wyo.1981); Thomas J. Carroll, III, *State Jurisdiction Over the Regulation of Energy Distribution and Other Public Utility Services,* 15 Land & Water L.Rev. 535, 552 (1980).

The general rate increase application traditionally covers all facets of a utility's operations, finances, rate design, and rate of return. In particular, WYO.STAT. § 37-2-119 (1977) lists

> such matters as the cost or value, or both, of the property and business of any public utility, used and useful for the convenience of the public, and all matters affecting or influencing such cost or value, the operating statistics * * * both as to revenues and expenses and as to the physical features of operation in such detail as the [PSC] may deem advisable; the earnings, investment and expenditures * * *.

Also, WYO.STAT. § 37-2-122 (1977) lists "depreciation of plant, obsolescence of equipment, expense of operation, physical and other values of the plant, system, business and properties of the public utility whose rates are under consideration."

At the hearing giving rise to this appeal, PSC's principal rate engineer, David M. Mosier, testified concerning the nature and scope of a general rate application. From his testimony we learn that about eighty-five percent of MDU's total cost of service relates to gas costs. Such gas costs are within the jurisdiction of FERC, not PSC. A general rate application, then, is concerned with that remaining fifteen percent of MDU's total cost of service which is within PSC's retail rate jurisdiction. This is the non-gas component of the retail rate. According to Mr. Mosier, in a general rate application there is a "comprehensive evaluation" of all of those statutorily listed factors that influence that fifteen percent of total cost of service which is within PSC's jurisdiction. Only upon such an evaluation does PSC have the detailed evidence necessary to render an informed decision on any permanent change in rates. During that evaluation, PSC has an opportunity to examine rate spread relationships among classes of customers. In a general rate application the utility must "lay out a cost of service analysis [for its operations]." Included in the analysis would be "allocations of its common plant between jurisdictions and an analysis of rate spread within the State of Wyoming." Mr. Mosier further explained that such a general rate application gives the utility "the [fair] opportunity * * * if the [PSC] is going to adjust rates * * * to take into consideration all of the elements including known and measurable adjustments that go with such a rate filing."

On at least two occasions, this court has discussed those known and measurable adjustments that go with a general rate application, and we approved of PSC's basing future rates upon "figures derived from [a] historical test year which then were adjusted for known and measurable changes traditionally relied upon by the PSC." *Mountain Fuel,* 662 P.2d at 884; and *see, Mountain States Tel. and Tel. Co. v. Pub. Serv. Comm'n,* 698 P.2d 627 (Wyo.1985). We noted that "in the experience of the PSC it had found that appropriate adjustments for historical test-year data would adequately account for anticipated changes." *Mountain Fuel Supply,* 662 P.2d at 885. One of PSC's pertinent findings there was:

> 33. The Commission, in determining the rate base elements including rate of return must rely on factually-based evidence as far as possible under the "used and useful" and "known and measurable" ratemaking concepts. The Commission has accepted discounted cash flow, comparable earnings, and other evaluations as a basis in establishing a reasonable rate of return.

*Mountain Fuel,* 662 P.2d at 886.

We have observed that PSC's use of a historical test period "involves utilizing fig-

ures from the end of a twelve-month period of time * * * with adjustments made for known and measurable changes." 698 P.2d at 631. Reviewing seven particular adjustments made in the test-year calculations at issue, we noted that PSC pointed out "that it is obligated to adjust the test-year data for known and measurable changes where the changes are shown to be reliable and certain." *Mountain States*, 698 P.2d at 635.

The investigation, preparation, and presentation of a cost of service analysis appropriate for a general rate application requires time and money. In the case at hand, Mr. Mosier expressed concern that a general rate case for MDU would not have been completed until after the heating season. In *Spence*, 686 P.2d at 601, we pointedly referred to this aspect of a general rate case. Thus, the determination of "just and reasonable" rates in a general rate case is time-consuming and costly.

■ In sharp contrast, the pass-on application is narrow in nature and scope, is not as costly, and has as its chief purpose the expeditious passing through of FERC-regulated wholesale gas costs, an element of retail rates over which PSC has no jurisdiction. The pass-on application "is being used with increasing frequency because of rapid escalations in energy commodity costs * * *." Carroll, *supra*, at 552. "Originally, pass-on proceedings were created to quickly approve the cost adjustments which previously were determined, in large part, in FERC hearings. *Spence v. Smyth*, Wyo., 686 P.2d 597 (1984)." *Montana–Dakota Utilities*, 746 P.2d at 1275. In *Spence*, 686 P.2d at 601, we remarked, "To require a full rate hearing every time a pass-through is asked for would be unrealistic and next to impossible, as such could happen every other month." We recognized that in the context of an increase in the cost of wholesale gas, as to which FERC has exclusive jurisdiction, the "just and reasonable" determination is made in the FERC proceeding, not the PSC proceed-

ing. Therefore, when the utility applies to PSC for a rate increase based solely upon a FERC-authorized wholesale gas cost increase, PSC has no decision to make as to whether the requested increase is "just and reasonable." "The result must be that the PSC can accept the federally approved wholesale rate as given and decline to require Wyoming distribution utilities to prove that such wholesale rates are just and reasonable." *Spence*, 686 P.2d at 600.

At the hearing in this case, Mr. Mosier explained that the purpose of the pass-on application "is to enable [the utility] to recover [commodity costs] in a prudent manner quickly so that they don't have costs falling through the cracks that they have to absorb." In reply to the question why the utility's expeditious recovery of these wholesale gas costs is of paramount concern, Mr. Mosier explained, "the costs are so high and * * * they change very frequently. [Without swift recovery of these costs, the utility] would be in pretty severe financial trouble in short-order, in a matter of possibly months." [2]

Having briefly discussed the distinguishing features of the general rate application and the pass-on application, we now consider MDU's first contention challenging PSC's action in adjusting the non-gas component during the pass-on hearing in question.

■ MDU asserts that PSC rule at Section 249(b), pursuant to which PSC acted, expressly does not authorize an adjustment of the non-gas component in a pass-on proceeding. PSC rule reads:

Section 249. *Wholesale Utility Commodity Purchase Pass-on Procedure.* Pursuant to W.S. 37–3–106 (1977) as may be amended and the rate filing requirements of this Chapter, a utility may file an application to pass on to its utility customers in their rates, prospective cost increases in the utility's wholesale utility commodity; and the same will be autho-

**2.** In Conclusion of Law No. 9 in its final order dated February 12, 1992, the Commission observed that the pass-on procedure allows PSC to authorize the prompt pass-on of wholesale commodity cost increases "which if not allowed to be promptly passed on could endanger the utility's financial viability and ability to serve its customers as required by law."

rized subject to public notice, opportunity for hearing, and refund, if the evidence of record shows that:

a. The pass-on is for wholesale utility commodity cost increases not under this Commission's jurisdiction;

b. The pass-on will not increase the utility's rate-of-return, and its rate-of-return is at or below that last authorized by the Commission (if the rate-of-return is in excess of that authorized the pass-on amount will be reduced accordingly);

c. The pass-on is applied on an equal or proportionate basis to all class rates and the rate steps therein (excluding minimum charges);

d. All pass-on charges are filed as a separate cumulative rate rider or surcharge which will be blended into base rates at appropriate intervals in general rate case proceedings or as otherwise ordered by the Commission; and

e. There is provision for interest on overcollections to be made part of the refund. (Interest will include any interest received by the utility as ordered by the Federal Energy Regulatory Commission and, otherwise or in addition thereto, interest as determined by the Commission).

Focusing specifically on the parenthetical clause in subsection (b), MDU declares that the rule authorizes only a reduction of the "pass-on amount" with no mention of the non-gas component or base rates. We have carefully read PSC's appellate brief and do not find that PSC has directly responded to this specific contention. The gist of PSC's general response seems to be that since the non-gas component of the rate is within PSC's jurisdiction, about which there is no disagreement, PSC has authority to adjust that component at any proceeding.

The resolution of this specific contention need not long detain us. PSC rules, like the statutes from which they emerge, are strictly construed. *International Ass'n of Fire Fighters*, 702 P.2d at 1297; *Tri-County Elec.*, 525 P.2d at 8–9. The language of Section 249(b) is plain and unambiguous. We read the words "the pass-on amount will be reduced accordingly" to mean what they say. We cannot read them to say "The non-gas component or base rate will be reduced accordingly." PSC obviously knows the difference between the terms "pass-on amount" and "non-gas component or base rate." We hold that the rule itself as written does not authorize PSC to adjust the non-gas component or base rate in a pass-on proceeding. All recognize that no relationship exists between FERC-regulated gas costs and PSC regulated rate-of-return. At the hearing Mr. Mosier satisfactorily explained this truth. Gas costs are recovered on a dollar-for-dollar basis through the balancing account system. That system has nothing to do with a utility's over-earnings situation which relates to the rate-of-return. As written, Section 249(b) contains a *non sequitur*. A reduction of the pass-on amount would have no effect on the rate-of-return. The pass-on amount and rate-of-return have no relationship. The former relates to FERC-regulated gas costs, the latter to PSC regulated non-gas cost elements. Our holding on this specific contention does not, however, answer the next contention which is whether, under general statutory authority, PSC properly acted to adjust the non-gas component or base rate in a pass-on proceeding. To that issue we now move.

MDU acknowledges, as it must, that general statutory authority allows PSC to determine whether retail rates under its jurisdiction are just and reasonable. MDU further acknowledges, as it must, that adjustment of the non-gas component or base rate is within PSC's authority, as it is a feature of the just and reasonable determination. MDU asserts, however, that in this particular instance, PSC failed to notify MDU of the true nature of the hearing and of the particular matters on which PSC might act. In other words, MDU argues, in effect, that PSC failed to notify it that PSC was going to treat the pass-on application as a general rate application. In that context, PSC also failed to investigate and determine properly whether non-gas costs savings existed in MDU's operations, such that a reduction in the non-gas component or base rate was warranted.

As PSC is an agency as defined for purposes of the Wyoming Administrative Procedure Act, it is subject to that act's provisions. Wyo.Stat. § 16–3–101(b)(i) (1990); *Montana–Dakota Utilities.* The two basic types of rate increase applications, a general rate case and a pass-on rate case, qualify as a contested case as defined in § 16–3–101(b)(ii). *See also, Montana–Dakota Utilities.* Under that act, § 106 of PSC's Rules of Practice and Procedure provides that "[n]otice of hearing shall conform to the Wyoming Administrative Procedure Act." In any contested case, the utility "shall be afforded an opportunity for hearing after reasonable notice." Wyo.Stat. § 16–3–107(a). According to Wyo.Stat. § 16–3–107(b)(i) and (iv) (1990), "[t]he notice shall include a statement of: The time, place and *nature of the hearing;* * * * [and] a short and plain statement of *the matters asserted.*" (Emphasis added).

MDU claims, in effect, that neither PSC's notice dated August 29, 1991, nor Mr. Eliopulos's letter dated September 4, 1991, apprised MDU that the nature of the hearing had been or would be converted from a pass-on rate hearing to an "interim" general rate hearing. Indeed, there seems to have been confusion with two of the commissioners about the validity of the September 4 letter.[3] Noticeably missing from the listing of the matters asserted in the notice and in the letter is any mention

that PSC might consider an adjustment in the non-gas component or base rate to correct for the alleged overearnings as allegedly reflected in MDU's 1989 and 1990 annual reports.

PSC argues that the September 4 letter adequately notified MDU, in accordance with Section 294(b), that if PSC determined MDU was overearning, PSC would adjust the "pass-on increase." The letter did not refer to the "pass-on increase"; rather, it referred to the "pass-on amount." The subject of Section 249 is the pass-on of "prospective cost increases * * * in the utility's wholesale utility commodity." The term "pass-on amount" appearing in Section 249(b) can only be referring to that subject, *viz.,* prospective cost increases in the wholesale commodity. PSC's argument is not persuasive.

In discussing the requirements of an adequate notice, we have said, "The important question is whether or not the parties had fair notice of the issues involved." *Glenn v. Bd. of County Comm'rs, Sheridan County,* 440 P.2d 1, 4 (Wyo.1968); *see also, Powell v. Bd. of Trustees of Crook County Sch. Dist. No. 1,* 550 P.2d 1112, 1116–17 (Wyo.1976); *Bd. of Trustees, Laramie County Sch. Dist. No. 1 v. Spiegel,* 549 P.2d 1161, 1170–72 (Wyo.1976).

What is "fair notice" as applied to this case? If a utility is going to be required, in a pass-on proceeding—the purpose of

---

**3.** During the hearing two of the three commissioners expressed some confusion about the validity of Mr. Eliopulos's September 4 letter. Specifically, that confusion was expressed in the context of the issue of MDU's alleged overearnings in its electric utility operation. In the September 4 letter, Mr. Eliopulos told MDU that PSC requested similar information concerning overearnings on the electric operation as it was requesting for the gas operation. During the hearing examination of MDU's witness Donald Ball, Commissioner Tucker stated he was there "to hear the gas side of the utility" and not the electric side. Commissioner Smyth agreed, ruling that "any testimony or questions concerning the impact of electric utilities will not be recognized by the commission, will not be allowed." After discussion between Commissioner Smyth and the attorney representing the Consumer Representative Staff concerning whether the electric operation information was to be presented at the hearing, Commissioner Tucker

stated it was not his understanding that PSC wanted that kind of information in this case. Again, agreeing that the electric operation information was not a proper subject of the present hearing, Commissioner Smyth stated, "And frankly, if that was a letter from the commission, then I was not a party to making that decision." As a result, although the letter had called for "detailed explanations regarding the electric utility overearnings similar to that requested for the gas utility operation," PSC opted to disregard that part of the letter. The referenced dialogue draws into some question whether PSC authorized the September 4 letter. In view of our disposition of the case, however, we need not explore the point further. It suffices to say that should an agency wish to amend its official notice of a contested case hearing, the preferred mode of amendment is the issuance of an amended order under the authority of the agency.

which is to allow PSC to authorize the "prompt" pass-on of wholesale commodity cost increases—to present evidence of a kind and in a manner that traditionally is reserved for a general rate proceeding, then it is necessary that PSC specifically inform and notify it of that changed nature of the hearing. In doing so, the statement of the matters asserted must include fair apprisal that PSC may adjust the non-gas component or base rate.

If the utility is not so informed before the hearing, there is a danger that confusion in the proper placement of the burden of proof may result. Although the utility bears the burden of proof to show its rate is just and reasonable, in a pass-on proceeding, the subject of which is only FERC-approved wholesale commodity cost increase, that proof burden has been established by FERC approval. Thus, at the pass-on hearing the utility in a real sense has no burden of proof to carry. *See generally, Spence.* If PSC converts the pass-on proceeding to an "interim" general rate proceeding, however, a burden of proof arises as to the non-gas cost factor placed in controversy. Here, PSC purported to place MDU's overearnings and consequent rate-of return in controversy as if in a general rate proceeding. Fairness dictates that the party on whom the burden of proof rests be fairly alerted to the issues at stake and the action that may be taken. As that was not done here, we hold that the notice was defective.

Before leaving this subject matter, we will comment briefly about the general advisability of injecting into the pass-on procedure issues that are meant to be resolved in a general rate procedure. PSC asserts that it is acceptable for it to act on rate-of-return issues in a pass-on case. It relies on this court's holding that PSC had the authority to adjust an incentive. award in a pass-on case and need not wait to do so in a general rate case. *Montana–Dakota Utilities,* 746 P.2d at 1275. The rationale for that holding was quite simple: as an incentive is cost-based and an incentive award determined primarily by the costs passed on, it makes sense to adjust an incentive award in the same proceeding in which the gas costs are passed on. Adjusting an incentive award is compatible with the purpose of the pass-on procedure, that is, they both can be quickly done. The nature and the purpose of the pass-on procedure has not been altered.

In sharp contrast, adjusting non-gas cost factors is incompatible with the nature and purpose of the pass-on procedure. Injecting base rate or non-gas component investigation, presentation, and analysis into the relatively simple and intentionally abbreviated pass-on case runs the serious risk of defeating the chief purpose of the procedure, *viz.,* a prompt adjustment so that the utility is not faced with large costs that threaten its very financial survival. As Mr. Mosier, the rate engineer, testified, unless these increased gas costs are passed through to the consumer in rapid order, the utility may very soon face financial calamity. We have seen that a cost-of-service analysis in a general rate case is time-consuming and costly. By introducing features of that time-consuming and costly general rate case into the relatively expeditious and inexpensive pass-on case, PSC may very well have defeated the very reason for existence of the pass-on procedure. We do not perceive, however, that the wisdom of that "conversion" or "introduction" is within our jurisdiction to decide. The pass-on procedure is a creation of PSC in the exercise of its regulatory and supervisory powers. This court cannot usurp the regulatory and supervisory function delegated to PSC.

We have one final issue to treat. MDU contends that PSC's reduction of the non-gas component to correct for MDU's alleged overearnings in 1989 and 1990 does not satisfy the necessary evidentiary requirements.

Since we are remanding this case, we are reluctant to discuss at length MDU's contentions regarding the evidentiary deficiencies of PSC's non-gas component adjustment action. We merely wish to point out that such action must be based on substantial evidence. Appropriate evidence would be that which has been traditionally pre-

993

sented in general rate cases. We identified such evidence earlier in connection with our discussion of the nature and scope of a general rate case. Compared with that detailed evidence traditionally presented in a general rate case, the mere evidence of two years' overearnings from unadjusted annual reports, which PSC relied on here, hardly seems to pass muster. On remand, we are confident that the parties will take appropriate measures concerning the quality and quantity of evidence.

In summary, we affirm PSC's action in revising the refund apportionment. Substantial evidence supported that decision. We hold that PSC may adjust a non-gas component in a pass-on rate increase hearing, provided that PSC adequately notifies the utility of the nature and scope of the hearing—including the specific matters upon which action may be taken. In this instance, PSC's notice was inadequate. Therefore, we reverse PSC's action in adjusting the non-gas component. We remand for further proceedings consistent with this opinion.